IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

v.

[2] ANGEL RAMOS-CRUZ,
Defendant.

CRIM. NO. 15-075 (GAG)

## UNITED STATES' MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Puerto Rico, hereby submits its Memorandum in Aid of Sentencing.

### I. The Murder of Lieutenant Albarati

On February 26, 2013, Lieutenant Osvaldo Albarati-Casañas, an employee with the Bureau of Prisons (BOP), was assassinated as he left MDC Guaynabo after his shift. Lt. Albarati was shot over sixteen (16) times during a drive by shooting that utilized four (4) fully automatic firearms. Lt. Albarati was struck 11 times in the head, torso, and face. Lt. Albarati was pronounced dead on the scene on Highway 22 less than 5 miles from MDC.

Lieutenant Albarati was well regarded by his colleagues as someone dedicated to enforcing the rules of the BOP facility. *See* D.E. 2706, PSR of Angel Ramos-Cruz, p. 25 ("Osvaldo Albarati represented the best of the Agency. The Agency's Core Values are Respect, Integrity, and Correctional Excellence and he demonstrated each of those values."). This reputation often put him at odds with many of the inmates in the facility. Specifically, those inmates that were perceived as leaders within the hierarchy of the inmate population. Ultimately, over the course of several years the government's investigation revealed that Lt. Albarati's murder was directly related to his profession and the plot to have him murdered spawned from within MDC Guaynabo.

1

As the government's statement of facts from [2] Ramos-Cruz's Plea Agreement details, in early 2013, [2] Ramos-Cruz was an inmate at the Metropolitan Detention Center and was housed in Unit 2-B. [2] Ramos-Cruz was identified as one of the leaders in Unit 2-B and was subject to frequent searches conducted by Lt. Albarati and other BOP personnel. Lt. Albarati seized contraband from Ramos-Cruz that subjected him to disciplinary actions to include solitary confinement and the elimination of visits and telephone calls. Some of the contraband seized by Lt. Albarati included contraband cellphones that were expensive for inmates to smuggle into MDC, Guaynabo.

As a result of the continuous seizures made by Lt. Albarati, [2] Ramos-Cruz and co-defendants [1] Oscar Martinez-Hernandez and [3] Miguel Diaz-Rivera (both inmates at MDC) devised a plan to have him murdered as he left the facility. The murder was to take place after Lt. Albarati finished his shift at MDC and was on his way home in his car. [2] Ramos-Cruz would provide the enforcers the information pertaining to the vehicle description and the time Lt. Albarati would leave MDC.

From inside MDC, Ramos-Cruz contacted an associate, [4] Juan Quinones-Melendez a.k.a. El Manco, and requested that El Manco recruit the triggermen to carry out the hit or "vuelta". "Vuelta" which translates in English to "turn" or "errand" was a term that the organizations of [5] Orlando Mojica-Rodriguez and [4] Quinones-Melendez would use to describe a plan to commit a murder. [4] Quiñonez-Melendez contacted his fellow associate [5] Orlando Mojica-Rodriguez a.k.a. "Yogui," to shore up resources and triggermen. [4] Quiñones-Melendez recruited [7] Carlos Rosado-Rosado a.k.a. "Cano" and [6] Jayson Rodriguez-Gonzalez, a.k.a. "Gonzo," to participate in the murder of Lt. Albarati. Meanwhile, [5] Mojica-Rodriguez recruited [8] Alexander Rosario de Leon, a.k.a. "Coqui," as an additional enforcer to participate in the murder.

[1] Oscar Martinez-Hernandez and [3] Miguel Diaz-Rivera discussed the financing of the murder and agreed to contribute money to ensure the murder was carried out. On February 26, 2013, [2] Ramos-Cruz and [1] Martinez-Hernandez discussed that the murder would that night and made plans to signal to one another when Lt. Albarati left his facility. [1] Martinez-Hernandez's cell had a direct view of the parking lot where Lt. Albarati parked and he could easily see Lt. Albarati as he left the facility.

That night, [1] Martinez-Hernandez signaled to the cell of [2] Ramos-Cruz who was in direct contact with the shooters via a contraband cellular phone, that Lt. Albarati had left the facility. [2] Ramos-Cruz ultimately gave the waiting shooters the signal that Lt. Albarati was leaving in a white Hyundai Veloster. [2] Ramos-Cruz told [7] Rosado-Rosado that the Veloster was getting ready to get on highway 22. [8] Rosario de Leon observed the white Veloster pass them as they were parked on the shoulder and [7] Rosado-Rosado merged onto highway 22 and followed the Veloster. Before they approached the Rio Honda Shopping Center, [7] Rosado-Rosado pulled his Yaris very close to the white Veloster and [6] Rodriguez-Gonzalez and [8] Rosario de Leon rolled down their windows, pulled out the firearms, and fired into the vehicle driven by Lt. Albarati. Both [6] Rodriguez-Gonzalez and [8] Rosario de Leon had two weapons each and fired until they were empty. At some point, [8] Rosario de Leon's firearm jammed, but he was able to clear the firearm and continue shooting. [7] Rosado-Rosado exited on the Rio Honda exit and eventually got back onto highway 22 heading in the opposite direction towards Caguas. Afterwards, [7] Rosado-Rosado, using the cellphone provided by [4] Quiñonez-Melendez, contacted [2] Ramos-Cruz to inform him that the murder was done.

II. **Applicable Law**

In *United States v. Booker*, the Supreme Court rendered the federal sentencing guidelines

(the "Guidelines") advisory. *See, e.g.*, *United States v. Murphy-Cordero*, 715 F.3d 398 (1st Cir. 2013) (citing *United States v. Booker*, 543 U.S. 220, 245 (2005)). The First Circuit has "encouraged district courts to follow a specifically delineated roadmap when sentencing under the now-advisory federal sentencing guidelines." *United States v. Davila-Gonzalez*, 595 F.3d 42, 46 (1st Cir. 2010). In other words, district courts:

> [O]rdinarily should begin by calculating the applicable guideline range; then determine whether or not any departures are in order; then mull the factors delineated in 18 U.S.C. § 3553(a) as well as any other relevant considerations; and finally, determine what sentence, whether within, above, or below the guideline range, appears appropriate.

*United States v. Pelletier*, 469 F.3d 194, 203 (1st Cir. 2006) (citing *United States v. Jimenez-Beltre*, 440 F.3d 514, 518-19 (1st Cir. 2006) (en banc)).

Although the Guidelines are no longer mandatory, district courts must continue to "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings, *id.* at 49, and must "remain cognizant of them throughout the sentencing process." *Id.* at 50 n.6. Additionally, district courts have an obligation to form their own views of the "nature and circumstances of the offense and the history and characteristics of the defendant," and to then impose a sentence "sufficient, but not greater than necessary," to accomplish the objectives of criminal sentencing, which are:

A. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

B. to afford adequate deterrence to criminal conduct;

C. to protect the public from further crimes of the defendant; and

4

  D. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2)(A)-(D).

  III. **Defendant's Criminal History and Role in the Offense**

  **A. The Applicable Guideline Range and Criminal History Category**

  The PSR has accurately calculated the sentencing guideline range and the defendant's criminal history category. (PSR of Angel Ramos, pp. 28, 31.) The defendant has a criminal history category of VII and a total offense level of 44. As such, the guideline recommendation is a term of 360 months-life. The government is recommending that the court follow the guidelines and sentence the defendant to a term of imprisonment of 360 months for counts 1, 2, 5, and 6 and to 240 months for Counts 3 and 4. The government recommends that the sentences in these 6 counts run concurrent to one another but run consecutive to the federal sentence in Criminal Case No. 12-200 (ADC). Ramos-Cruz was pending trial in 12-200 (ADC) when he committed the instant offense. Rewarding the defendant with a concurrent sentence would truly undermine the rule of law and would result in a sentence that does not reflect the severity of his conduct. The defendant has received in enormous benefit by having a term of imprisonment less than a life sentence.

  **B. Defendant's Role in the Offense**

  Defendant [2] Ramos-Cruz was a central player in the planning, financing, and execution of the murder of Lt. Albarati. Ramos-Cruz coordinated with individuals within MDC and outside in the free community to effectuate this brutal and senseless murder. Even today, the defendant doesn't seem to appreciate the gravity of this offense and the impact it has had on the community. *See* D.E. 2706, PSR of Angel Ramos-Cruz, p. 26 ("[Ramos-Cruz] stated that what led him to commit this offense was that the victim had it against him.")

IV. **<u>Conclusion</u>**

For the foregoing reasons, the United States respectfully recommends that this Court sentence the defendant to serve a term 360 months for counts 1, 2, 5, and 6 and to 240 months for Counts 3 and 4. Moreover, the government requests that this sentence be consecutive to his sentence in 12-200 (ADC).

I hereby certify that on the date below, I electronically filed the foregoing memorandum with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 29th day of April, 2019.

**ROSA EMILIA RODRIGUEZ-VELEZ**
United States Attorney

*s/ Nicholas W. Cannon*
Nicholas W. Cannon
Assistant U.S. Attorney
U.S.D.C. G01814
Torre Chardón, Suite 1201
350 Carlos Chardón Street
San Juan, Puerto Rico 00918